United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL MERRELL,

Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.,

Defendant.

Case No. 23-cv-06664-WHO

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 41, 46, 51, 55, 61, 62, 67, 68, 70, 77, 78, 79, 80, 81, 83, 90, 93, 94, 96, 99, 100, 101

Plaintiff Paul Merrell ("Merrell") brought this lawsuit under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, against defendant Marriott International, Inc. ("Marriott"), alleging that blind screen reader users like Merrell were unable to properly navigate its website to book hotel stays. Merrell is a serial ADA plaintiff and Marriott attacks his credibility in many ways. Credibility is a jury issue. But the merits issues in Marriott's motion for summary judgment are different: does Merrell have standing and did Marriott's website violate his rights under the ADA by differentially treating visually impaired persons because of the absence of auxiliary aids and services? On this record, there is no dispute of material fact that Merrell lacks standing and Marriott's website met ADA standards for Merrell's purposes. I will GRANT Marriott's motion for summary judgment.[1]

---

[1] This order also addresses the six other motions related to the motion for summary judgment. Marriott filed a (1) motion to exclude Merrell's summary judgment declaration; (2) motion to deny certification of Merrell's proposed class damages; (3) motion to apply the one-way intervention rule to decide the class certification motion before summary judgment; and (4) motion to exclude Merrell's expert Dr. William C. Easttom ("Easttom"). Merrell filed a (5) motion to file a sur-reply to Marriott's summary judgment motion; and (6) motion to strike evidence from Marriott's summary judgment reply.

## BACKGROUND

### 1. Merrell's Complaint

To orient the reader, I give a brief summary of what Merrell claims in his Complaint. Some of the alleged facts are contested, but none impacts the basis for my ruling in this case.

Merrell states that he is "legally blind [and] visually impaired." Amended Complaint ("AC") [Dkt. No. 33] ¶ 4. He "cannot use a computer, cellphone, or tablet without the assistance of screen-reading software." *Id.* ¶ 27. As a result, Merrell alleges that he uses Job Access With Speech ("JAWS"), a software program that allows visually impaired people to "access websites using keyboards in conjunction with [its] screen access software that vocalizes the visual information found on a computer screen." *Id.* ¶¶ 17–18, 27. For screen-reading software to function, "the information on a website must be capable of being rendered into text." *Id.* ¶ 21. Should the content of a website not be capable of rendering the website into text, a visually impaired person using a screen reader is "unable to access the same content available to sighted users." *Id.*

Sometime between July 1 and July 5, 2022, Merrell visited Marriott's website (https://www.marriott.com/default.mi) because he says that he wanted to book a hotel to visit his son in Tacoma, Washington. *See id.* ¶ 27; Deposition of Paul Merrell ("Merrell Dep.") [Dkt. No. 41-1] at 78:7–12, 82:10–18.[2] Merrell used his personal Dell computer to visit the website. Merrell Dep. at 78:22–24. While he had never visited his son in Tacoma, Merrell stated that he was "looking to maybe, you know, drop in, celebrate [his] birthday with him, and enjoy some company." *Id.* at 83:13–15, 84:9–17. He had not discussed the trip with anyone else, as he was planning to travel alone. *Id.* at 84:22–23, 86:20–21. And while he had no fixed dates in mind, he says that he planned to stay "probably a couple of days" around his son's birthday. *Id.* at 82:24–83:1, 86:3–5. Merrell's goal was to "book one room for [him]self." *Id.* at 86:22–24.

---

[2] The exact date and point of access to the Marriott website is unclear. As discussed later, Merrell threw away the hard drive to the computer that he used to perform the search in 2023. *See* Merrell Dep. at 97:24–98:24. As a result, there are no records confirming that Merrell visited marriott.com in July 2022. *See id.* Merrell's conduct spoliating critical evidence may lead to an adverse inference instruction at trial.

2

United States District Court
Northern District of California

Upon entering the website, Merrell alleges that he used his JAWS screen reader to tab to the "Find a Hotel" subpage. *See* AC at ¶ 28; Merrell Dep. at 91:2–13. While on this page, Merrell purportedly "encountered multiple access barriers." AC ¶ 28. First, "while attempting to navigate [Marriott's] website to reserve a room at one of [its] hotels, [Merrell] encountered improperly coded form elements which prevented him from using his screen reader to complete a reservation." *Id.* Merrell was "unable to input his desired number of guests" on the "Find a Hotel" page, as "the buttons to increase and decrease the number of guests were not coded to allow screen readers to announce the updated number of guests when activated." *Id.* "Instead, when the buttons were activated, [Merrell's] screen reader announced nothing, giving [him] the impression that the buttons were non-functional and preventing him from inputting the desired number of guests in order to reserve a room." *Id.*

Additionally, Merrell asserts that Marriott's website included portions that screen readers cannot announce. *Id.* ¶ 29. On the "Find a Hotel" page, "drop-down menus such as the 'Rooms and Guests' menu d[id] not include the necessary coding for screen readers to announce whether the menus [we]re in the expanded state or collapsed state." *Id.* Instead, the screen readers "announce[d] nothing, preventing users who rely on a screen reader from using these menus to search for and book a hotel room using the website's 'Find a Hotel' page." *Id.*

As a result of these defects, Merrell sued Marriott, alleging violations of the ADA and California's Unruh Civil Rights Act, Cal. Civ. Code § 51. AC ¶¶ 61–72. He brings the ADA claim on behalf of himself and a putative class of "legally blind individuals who have attempted to access Defendant's website using screen-reading software from January 2022 up to and including final judgment in this action." *Id.* ¶ 48. For his Unruh Act claims, he seeks to cover a California subclass of "all legally blind individuals in the State of California who have attempted to access Defendant's website using screen-reading software during January 2022 to July 31, 2023." *Id.* ¶ 49.[3]

---

[3] Merrell was not the original plaintiff in this case. Vivian Salazar originally filed this lawsuit, but Merrell was substituted as the named plaintiff in May 2025. *See* Stipulation and Order Regarding Plaintiff's First Amended Complaint and Case Schedule [Dkt. No. 32].

United States District Court
Northern District of California

### 2. **Anomalies At Play**

The posture of this motion is unusual and bears explanation. I originally gave Marriott permission to file an early summary judgment motion because it claimed that its expert would irrefutably show that Merrell did not suffer any interference with his rights under the ADA when he accessed the Marriott website.[4] Its understanding of Merrell's complaint was that he only accessed the landing page of Marriott's website, and its motion focused on that page. Motion for Summary Judgment ("MSJ") [Dkt. No. 41] at 3–6; Marriott's Reply in Support of Motion for Summary Judgment ("MSJ Repl.") [Dkt. No. 61] at 7–12. Its understanding was wrong: in opposition to the motion for summary judgment, Merrell clarified that the problems occurred on the "Find a Hotel" subpage, not the landing page. *See* Plaintiff's Opposition to Defendant Marriott's Motion for Summary Judgment ("MSJ Oppo.") [Dkt. No. 51] at 1–3.

Marriott accused Merrell of changing his theory to avoid summary judgment, *see* MSJ Repl. at 7–12, but I concluded that Merrell's theory was sufficiently alleged in the Complaint and his deposition testimony prior to the motion. Marriott's reply then addressed the "Find a Hotel" subpage with new evidence, *see* Terepka Reply Decl. [Dkt. No. 61-1] Ex. F (Verizon records), Ex. G (Merrell telephone number), which drew both a motion to strike and motion to file sur-reply from Merrell. *See* Plaintiff's Objections and Motion to Strike or Disregard Defendant's New Evidence ("Strike Mot.") [Dkt. No. 66] at 1; Plaintiff's Administrative Motion for Leave to File Sur-Reply ("Sur-Reply Mot.") [Dkt. No. 67] at 1. Given the dispute over what Merrell's claim was, I decided to allow each side to supplement the record so that the merits issue on the "Find a Hotel" page could be resolved. For that reason, I DENY Merrell's motion to strike evidence filed with Marriott's reply, GRANT his motion to file a sur-reply, and DENY Marriott's motion to strike his declaration as a sham affidavit.

A second issue involves how Merrell actually accessed the website. He has provided a declaration and deposition testimony. *See* Declaration of Paul Merrell in Support of Plaintiff's

---

[4] Marriott's motion to deny class certification and motion to apply the one-way intervention rule are both DENIED. It would be unfair to decide these motions prior to the close of discovery, considering that I stayed discovery at Marriott's request in light of its early summary judgment motion.

United States District Court
Northern District of California

Opposition to MSJ ("Merrell Decl.") [Dkt. No. 51-5] ¶¶ 2–8; Declaration of Chumahan Bowen in Opposition to MSJ [Dkt. No. 51-1] Ex. A Deposition of Paul Merrell ("Merrell Dep.").  But remarkably, even though he is a serial ADA plaintiff, he disposed of the hard drive on his computer that he used to perform the search, and he kept no notes of that search.

Because of uncertainty about the alleged search, I ordered that the parties engage an expert to perform a computer forensic examination of Merrell's Dell computer and Google accounts. Order on Device Inspection [Dkt. No. 65].  The parties jointly proposed a consultant, who I then appointed.  Joint Discovery Letter Brief [Dkt. No. 74]; Device Inspection Protocol [Dkt. No. 76]. Among the consultant's findings, he could not identify the use of the screen reader software JAWS, including its installation, execution or use.  Declaration of Alex Terepka ISO Marriott's Notice of Device Inspection Results and Administrative Motion to Consider Whether Another Party's Materials Should Be Filed Under Seal ("Terepka Decl.") Ex. A Neutral Examiner Report. He found no "Marriott.com" entries in the active structured web browser history, which prevented reconstruction of complete web page visits, but did find "Marriott.com" in unallocated clusters, file slack, pagefile, and unstructured data areas.  The consultant's report raises serious questions about the accuracy of Merrell's testimony but is not dispositive for any issue at summary judgment.

A third anomaly is Merrell's shifting testimony on a variety of germane topics, such as which Marriott properties he wants to visit, his wife's ability to travel, and his plans to travel to Tacoma to visit his son.  The evidence of his intent to travel is almost non-existent, besides his testimony, and there was no evidence of trips or phone records showing calls with his son.  I discuss this further in the Standing section, below.

## LEGAL STANDARD

### I.      Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the

non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## II.   Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The function of a motion to strike under Rule 12(f) is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing of those issues before trial. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (citation omitted). Motions to strike "are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice." *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001). In most cases, a motion to strike should not be granted unless "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F.Supp. 2d 1048, 1057 (N.D. Cal. 2004).

## III.   Motion to Exclude

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where:

> (a) the expert's scientific, technical, or other specialized knowledge

*United States District Court*
*Northern District of California*

will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "To be admissible under Rule 702 expert testimony must be relevant and reliable." *Rodman v. Otsuka Am. Pharm., Inc.*, 564 F. Supp. 3d 879, 886 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 879, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

"Under the reliability requirement, the expert testimony must 'have a reliable basis in the knowledge and experience of the relevant discipline.'" *Rodman*, 564 F. Supp. 3d at 886 (quoting *Primiano*, 598 F.3d at 565). "To ensure reliability, the court must 'assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance.'" *Id.* "These factors are 'helpful, not definitive,' and a court has discretion to decide how to test reliability 'based on the particular circumstances of the particular case.'" *Id.* (internal quotation marks and footnotes omitted). "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

<div align="center">

**DISCUSSION**

</div>

I.    **Standing**

Marriott argues that Merrell lacks Article III standing to bring an ADA case. Injunctive relief is the only remedy available for ADA claims. Standing for injunctive relief requires a plaintiff to establish a "real and immediate threat of repeated injury." *Fortyune v. Am. Multi-Cinema, Inc.*, v, 1081 (9th Cir. 2004). In the ADA context, "a plaintiff—even a 'tester' plaintiff—

must allege sufficient facts to show an intent to return or that 'a defendant's failure to comply with the ADA deters [him] from making use of the defendant's facility.'" *Ho v. World Oil Corp.*, No. 8:25-cv-00069-SVW, 2025 WL 2598333, at *2 (C.D. Cal. Aug. 7, 2025) (quoting *Johnson v. JKLM Props., L.L.C.*, No. 5:20-cv-01078, 2020 WL 5517234, at *4 (N.D. Cal. Sept. 14, 2020)); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011). These are alternative, not cumulative, requirements. *See Crandall v. Starbucks Corp.*, 249 F. Supp. 3d 1087, 1105 (N.D. Cal. 2017) (Corley, M.J.).

While plaintiffs have two independent bases to allege an injury-in-fact, they may ultimately lack standing if they are "indifferent to returning to the [public accommodation] or [their] alleged intent to return is not genuine, or if the barriers [they] seek[] to enjoin do not pose a real and immediate threat to [them] due to [their] particular disability." *Chapman*, 631 F.3d at 944. To determine whether a plaintiff intends to return to the place of public accommodation, courts often consider "(1) the proximity of defendant's business to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant." *Brooke v. CSP Hospitality, LLC*, No. EDCV 20-2202 JGB (SHKx), 2021 WL 401990, at *4 (C.D. Cal. Feb. 2, 2021) (quoting *Johnson v. DTBA, LLC*, 424 F. Supp. 3d 657, 663 (N.D. Cal. 2019)). "But these are not definitive, and 'the key inquiry remains whether Plaintiff has a likelihood of returning to the [] premises.'" *Id.* (citation omitted).

### 1. No Injury In Fact Or Intent To Return

Marriott alleges that the record shows Merrell "does not genuinely intend to return" to a Marriott hotel and therefore has not suffered an injury-in-fact to confer standing. MSJ at 15. While Merrell contends that he planned to travel to Tacoma to visit his son for his birthday in July 2022, Marriott points to evidence that suggests that was never the case. *See id.*; Merrell Dep. at 82:14–83:9. Merrell admitted that he "(a) has never visited his son before, or Tacoma; (b) did not discuss this trip with his son and has not in the years since; and (c) was going to fly there, but hadn't flown in five to seven years." *Id.* at 17; Merrell Dep. at 83:13–85:5. Marriott submitted Verizon call logs showing that Merrell and his son do not "communicate by text or phone

8

regularly throughout the year," seemingly undermining Merrell's deposition testimony that they were in frequent contact. *See* Repl. at 14; Strike Oppo. at 6 (quoting Merrell Decl. ¶ 12).[5] Additionally, Merrell has "only stayed at one hotel in his life—a Marriott near his home—after his apartment flooded in 2017." MSJ at 17; Merrell Dep. at 22:10–24:2. Finally, when asked if he had plans to visit Tacoma, Merrell indicated, "[n]ot at this point. Life's happening, all that stuff." Merrell Dep. at 85:6–14.

Casting further doubt on his intent to return, Marriott argues that Merrell and his counsel's "other cases show a pattern of manufacturing lawsuits against hotel companies for purported website ADA violations without any genuine intent to visit a hotel." MSJ Supp. [Dkt. No. 46] at 2. Marriott highlights two cases that it believes shows ill-intent and a lack of standing: one litigated by plaintiff and both by his counsel. First, in *Merrell v. Singpoli Capital Corporation*, No. 5:20-cv-02632 (C.D. Cal. filed Dec. 22, 2020), Merrell sued a hotel in Pasadena for purported ADA violations on their website using the same counsel. MSJ Supp. at 3. However, at a later deposition, Merrell "admitted that he had no plans to visit Pasadena, so he never intended to go there or return." *Id.* Similarly, plaintiff's counsel represented the plaintiff in *Jimenez v. Hyatt Corporation*, a "copy-paste website ADA case like" this case. *Id.*; Case No. 2:23-cv-03028-TLN-CSK (E.D. Cal. filed Dec. 28, 2023). There, the plaintiff claimed that the Hyatt violated the ADA after she "purportedly encountered barriers on Hyatt's website while trying to book hotel stays." MSJ Supp. at 3; *see Jimenez* Complaint [Dkt. No. 1] at ¶¶ 26–36. At deposition, the plaintiff testified that she accessed Hyatt's website to book a "get-away trip with [her] boyfriend at the time." MSJ Supp. Declaration of Alex Terepka ("Terepka Supp. Decl.") [Dkt. No. 46-1] Ex. B Deposition of Flor Jimenez ("Jimenez Dep.") at 47:6–7. However, her then "boyfriend" clarified her story was false, as they were "not in a romantic relationship at any time during 2023." Terepka Supp. Decl. Ex. C Declaration of Julio Morones ¶ 3. Her boyfriend also testified that the plaintiff's "job" was "to visit hotel websites to generate ADA claims for [plaintiff's counsel]." *Id.*

---

[5] Merrell moved to strike the call logs. They are admissible as business records under Federal Rule of Evidence 803(6). I DENY Merrell's motion.

¶ 13.

With respect to his intent to book and visit a Marriott property, Merrell argues that he "will book [a hotel] through Marriott once the [purported] barrier is fixed, including for the Tacoma trip, for travel to Oklahoma and Oregon, and for a local staycation" in 2026. MSJ Oppo. at 16; Merrell Dep. at 117:4; 117:19–21; 181:19–182:7. He claims that he is seeking to book through Marriott because of his previously positive experiences staying at Marriott after his apartment flooded. Merrell Dep. at 22:13–16; 23:16–20; 181:19–182:7; 190:21–191:13; Merrell Decl. ¶ 11. Because of these plans, Merrell believes he "aligns with Ninth Circuit guidance that amenities-based preferences and repeated visits to the area support an intent to return." MSJ Oppo. at 17 (citing *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1038 (9th Cir. 2008)). He maintains that Marriott's reference to past cases litigated by him and his counsel do not support the conclusion that he lacks standing in *this* case. *See* MSJ Oppo. at 21.

Merrell also argues that the record shows each of the four *Brooke* factors are met. MSJ Oppo. at 17; *Brooke*, 2021 WL 401990, at *4 ("(1) the proximity of defendant's business to plaintiff's residence, (2) plaintiff's past patronage of defendant's business, (3) the definitiveness of plaintiff's plans to return, and (4) the plaintiff's frequency of travel near defendant."). First, Merrell lives near Marriott properties and "intends to use it for a local staycation." MSJ Oppo. at 17; Merrell Decl. ¶ 11. He previously stayed at a Marriott property for a total of two months, after his apartment flooded. *See id.*; Merrell Dep. at 22:10–24:2. Finally, he indicates that he "has plans to visit family in Washington . . . near his son's birthday in 2026, and to book a local staycation in the summer of 2026 at Residence Ince by Marriott in Murrieta." *Id.*; Merrell Dep. at 181:19–182:7; Merrell Decl. ¶ 11. He also points to another trip to visit Oklahoma to visit friends. *See* Merrell Decl. ¶ 11.

This is a slim record on which to rest an intent to return. With respect to definitiveness, Merrell now says that he has plans to visit Marriott properties in Washington, Oregon, Oklahoma, and Murrieta. *See* Merrell Decl. ¶ 11. But these claims are new; nowhere in the complaint does Merrell allege that he has these specific plans in the future. Indeed, there is no evidence that Merrell has ever stayed in any hotel for travel. Nor do his plans to travel with his wife appear to

United States District Court
Northern District of California

have merit. Merrell maintains that he has plans to "maybe take [his] wife to visit her friend – friends in Oregon." Merrell Dep. at 181:25–181:4. But just weeks ago, in order to avoid having her deposition taken, Merrell claimed that his wife is a "spastic quadriplegic" for whom "[t]ransport . . . is unsafe" and she fears leaving her home because she would be "bedridden" if her wheelchair broke. *See* October 20, 2025 Joint Discovery Letter [Dkt. No. 47] at 4. I find it difficult to reconcile these two statements.

Merrell's arguments regarding intent have also changed throughout the course of this litigation. In his deposition, Merrell first indicated that he had no current plans to visit Tacoma, Washington, indicating that "[l]ife's happening, all that stuff." Merrell Dep. at 85:6–14. Then later, Merrell changed course, indicating that he had "plans to go to Tacoma, Washington [and] Oklahoma." Merrell Dep. at 181:23–25. When questioned by Marriott's counsel about his changing position, Merrell stated: "I think it was because of the – the reason that when I was speaking, I was speaking as in, did I have plans at that very moment. But if I wanted to go to Tacoma to visit my son, it's nice and assuring to know that I could. I could go to a nice hotel and – and have a nice day while I visit – visit my son. So I would want to include Marriott in my visit to Tacoma. I just don't have a plan to visit him right now." *Id.* at 192:6–14. As I explain in detail below, such indications of intent to visit do not meet the Ninth Circuit's standard for standing in ADA cases.

Additionally, while Merrell stayed at a Marriott property once in 2017, he did so because his apartment flooded—not for personal travel, which he now claims to establish intent. *See* Merrell Dep. at 23:1–12. In fact, Merrell has never stayed at *any* hotel to visit anyone, ever. *Id.* at 22:10–24:2. And Merrell has not flown in the past five to seven years. *Id.* at 83:13–85:5. None of these facts by themselves mean that future travel is implausible, but in the aggregate they weigh heavily against the credibility of Merrell's claim of intent.

Merrell cites numerous cases to show that the Ninth Circuit recognizes "amenities-based preferences and repeated visits to the area [as] support [for] an intent to return," *see* MSJ Oppo. at 17, but each is easily distinguished. First, in *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031 (9th Cir. 2008), a paraplegic plaintiff from Sacramento sued a hotel in Santa Barbara for

providing an accommodation with "multiple and severe barriers to disabled access." *Id.* at 1034. On the question of standing, the court concluded that plaintiff sufficiently demonstrated an "intent to return to the geographic area where the [public] accommodation [was] located and a desire to visit the accommodation if it were made accessible." *Id.* at 1037. Plaintiff had visited Santa Barbara "approximately 1–3 times per year in connection with her work," as well as to "visit her friends . . ., to vacation with her children, and to perform work." *Id.* Additionally, after filing the lawsuit, plaintiff returned to Santa Barbara four more times for work and pleasure and had "three upcoming trips" at the time of her evidentiary hearing. *Id.* at 1038. The court emphasized that the "frequent" nature of plaintiff's travel during the relevant time period, coupled with her declarations that she would "definitely plan on staying at the [property] when it is made accessible," conferred upon her standing to bring an ADA lawsuit. *Id.* at 1038–39.

Here, there is little evidence supporting Merrell's intent to travel, let alone return, besides his say-so. Unlike in *D'Lil*, where plaintiff traveled to Santa Barbara numerous times a year for both work and personal matters, Merrell only stayed at a Marriott property once, in 2017, out of necessity when his apartment flooded. *See id.* at 1037–38; Merrell Dep. at 23:1–12. And while Merrell now says he "loved the accommodations" and intends to return for a staycation, this does not come close to the standard established in *D'Lil,* where the plaintiff's desire to stay at the hotel in question was supported by numerous declarations describing specific features that drew her to the property, including "the hotel's proximity to downtown, its accessibility from the freeway, . . . its amenities," and the ability for her to travel without the need of a companion, unlike other accessible hotels in the area. *See* 538 F.3d at 1038; *id.* at 1038 n.7. Merrell only indicates that "comfort and convenience and the amenities" were reasons to support his interest at staying at a Marriott property, along with the fact that "they're available anywhere you'd want to go." Merrell Dep. at 191:1–3. These facts do not rise to the same level of specificity and intent that the court in *D'Lil* found persuasive to find standing.

Merrell cites *Langer v. Kiser*, 57 F.4th 1085 (9th Cir. 2023), for the proposition that "preference plus proximity support[] intent." MSJ Oppo. at 18. In *Langer*, the plaintiff was a paraplegic man who was barred from accessing defendant's restaurant due to a lack of van-

12

accessible parking spaces. *Id.* at 1091. On the issue of standing, the court took issue with the lower court's "concerns about [plaintiff's] credibility [as it] found his testimony to be unreliable." *Id.* at 1094. Specifically, the court found that the lower court erred by taking into consideration the plaintiff's "history of ADA litigation" and number of lawsuits filed by plaintiff "as a basis for questioning the sincerity of h[is] intent to return." *Id.* at 1095. After conducting a *de novo* review, the court found that plaintiff sufficiently alleged standing, as him "return[ing] four or five times in a three year period" after filing suit was "convincing evidence that his professed intent to return [was] sincere and plausible." *Id.* at 1098. The court recognized that district courts "must be particularly cautious about affirming credibility determinations that rely on a plaintiff's past ADA litigation," as "most ADA lawsuits are brought by serial litigants." *See id.* (internal citations omitted). Indeed, it may be "necessary and desirable for committed individuals to bring serial litigation advancing the time when public accommodations will be compliant with the ADA." *Id.* A plaintiff's "intent to visit unrelated places he previously sued says little about his intent to visit" Marriott's hotels. *See* 57 F.4th at 1095 (internal quotations omitted).

Merrell filed a declaration indicating his intent to return to Marriott properties, identifying three alleged upcoming trips. Compare that to the plaintiff in *Langer,* who returned numerous times to the property, "submitted into evidence . . . 52 photos he took during [a] visit, documenting the accessibility barriers that existed at the time he filed his complaint," and lived ten minutes away from the store. *See id.* at 1098. Merrell, by contrast, does not travel and has only stayed in a hotel once in 2017 after his apartment was flooded. These facts suggest that his basis for standing is much weaker than the plaintiff in *Langer*.

Merrell also cites *Salazar v. Victoria's Secret & Co.*, No. 23-cv-06654-MMC, 2024 WL 3748348 (N.D. Cal. Aug. 9, 2024) (Chesney, J.), as an "illustrative example of how similar facts supported standing." MSJ Oppo. at 17. In *Salazar*, plaintiff, a "visually impaired and legally blind person who requires screen reading software to read website content," visited the Victoria's Secret website and made "multiple attempts to purchase" clothing "for instore pickup at [its] location in the San Francisco Centre Mall." *Id.* at *1. Plaintiff was unsuccessful, however, as the website's "Select Store" buttons were "inoperative with [her] screen reader." *Id.* On standing, the

13

court concluded that plaintiff sufficiently established a threat of repeated injury in the future. *See id.* at *3. While the court recognized that plaintiffs "must allege facts to show an intent to return to the area," here, plaintiff alleged that she "live[d] near Victoria's Secret's physical locations," including five brick-and-mortar stores "within an accessible distance from [her] residence." *Id.* Additionally, plaintiff is "near [Victoria's Secret's] physical locations at least two times a month, often utilizing the Bay Area Rapid Transit system to visit." *See id.*

Unlike the plaintiff in *Salazar*, Merrell has failed to show his proximity and frequency of his interactions with Marriott's properties. While Merrell lives near the Murrieta Marriott hotel, he has not alleged how frequently he utilizes its services. On these grounds, *Salazar* is inapposite. The other cases cited by Merrell fail on similar grounds. *See* MSJ Oppo. at 17 (citing *Pickern*, 293 F.3d at 1135 (intent supported by *weekly* frequency in vicinity of defendant's location); *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1040 (9th Cir. 2008) (plan to visit convenience store *annually* sufficient for intent)).

Credibility is a jury issue, to be sure. But the facts in this case clearly contradict Merrell's "intent" testimony.[6] He has offered no fact that would corroborate in any way his statement that he wanted to visit his son (such as communications with him), or travel with his wife (for whom transportation is unsafe), or stay in a hotel (which he has only done once). In sum, while Merrell says that he intends to visit a Marriott property in the future, I find on this record that his intent is not genuine.

### 2.    Deterrence

Merrell argues that the record shows deterrence due to his "aware[ness] of Defendant's 'Find a Hotel' webpage barriers," which results in him being precluded from visiting Marriott's hotels. *See* MSJ Oppo. at 17. In his view, awareness of deterrence is enough because "Plaintiff need not intend to visit the hotels until *after* remediation." *See id.* (emphasis added) (citing *C.R. Educ.*, 867 F.3d at 1100 ("[U]nder the ADA, once a plaintiff has actually become aware of discriminatory conditions existing at a public accommodation, and is thereby deterred from

---

[6] This finding does not rely in any way on the two other cases cited by Marriott involving Merrell's counsel, discussed above.

United States District Court
Northern District of California

visiting or patronizing that accommodation, the plaintiff has suffered an injury."). Here, Merrell alleges that the website's accessibility issues are the reason he is "not at this point" making a reservation, though he intends to in the future. *See* Merrell Decl. ¶ 11 ("I intend to use Marriott's website to book hotel reservations for these trips, and I will do so once the barriers on the 'Find a Hotel' page are removed."). He concludes that this is a "classic [case of] current deterrence caused by an identified ADA violation on a place of public accommodation's reservation system, which creates an injury in fact and a likelihood of future injury until fixed." MSJ Oppo. at 16.

*Chapman* provides the framework for deterrence. There, a Ninth Circuit panel held that "current deterrence is sufficient but not necessary for standing, and that plaintiffs with knowledge of an ADA violation at a place of public accommodation can establish a sufficient future injury for standing by either (1) showing that they are currently deterred from returning to the place of public accommodation because of a barrier, or (2) showing that they were previously deterred and intend to return to the non-compliant place of public accommodation." *Langer*, 57 F.4th at 1093 (citing *Chapman*, 631 F.3d at 944).

The complaint appears to plead both elements of *Chapman*. It alleges that the "access barriers on Defendant's website have deterred Plaintiff and the Class Members from enjoying the goods and services of Defendant's brick-and-mortar hotels which are offered through Defendant's website in a full and equal manner to sighted individuals. Plaintiff and Class Members intend to visit the Defendant's locations if Plaintiff and Class Members could access Defendant's website fully and equally as a sighted person can." AC ¶ 38. It also states that the barriers have "caused a denial of Plaintiff's and the Class Members' full and equal access in the past and now deter Plaintiff and the Class Members on a regular basis from accessing the website." *Id.* ¶ 37. If backed up by evidence, these allegations would establish current deterrence and thus standing. *See Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002) (finding that "actual knowledge of the barriers to access," combined with the plaintiff's indication that they would utilize the public accommodation "if it were accessible," was sufficient to establish actual or imminent injury). But the evidence belies the allegations.

The threshold showing to deterrence is that Merrell had an intent to visit in the first place

15

that was deterred. *See Brooke*, 2021 WL 401990, at *4 ("[T]he key inquiry remains whether Plaintiff had a likelihood of returning to the [ ] premises."); *see also Gomez v Miersch*, No. 21-cv-08936, 2022 WL 1271009 (N.D. Cal. filed Apr. 28, 2022) (no nexus establishing deterrence "where the plaintiff is merely curious about the business.")  In light of the evidence described above, or lack thereof, no reasonable jury could find that Merrell had such intent.  In this unusual case, Merrell's claim to the contrary is insufficient to create a dispute over whether the purportedly non-compliant website deterred any intent to visit, let alone return.  Merrell lacks standing to sue.

## II. There is No Material Dispute Over the Website's Compliance

### A. The Undisputed Evidence

I now turn to the merits because there is a second reason to grant summary judgment.  As Marriott argues, summary judgment is warranted because Merrell's allegations are "factually incorrect."  MSJ at 12 (quoting *Gomez v. Trinitas Cellars*, 2022 WL 2194658, at *3 (N.D. Cal. June 17, 2022)).

The Complaint alleges that Merrell was "unable to input his desired number of guests using Defendant's 'Find a Hotel' page because the buttons to increase and decrease the number of guests [announced] nothing, giving Plaintiff the impression that the buttons were non-functional and preventing him from inputting his desired number of guests in order to reserve a room"; and (2) "the 'Rooms and Guests' menu [did] not include the necessary coding for screen readers to announce whether the menus are in the expanded state or the collapsed state" and "instead announce[d] nothing."  AC ¶¶ 28–29.

The facts are different.  Marriott cites the findings of its expert, Craig Davis, to show that the "hotel search bar, including the drop-down to change the rooms and guests if needed, works properly with screen readers."  MSJ at 7.  Davis "successfully used" his computer with JAWS on Marriott's 2025 website to "expand the rooms and guests dropdown and change the default option by adding or removing rooms, adults, or children."  Davis Decl. ¶ 10.  JAWS "announced each of these modifications," and he was able to "successfully navigate[], underst[an]d, and access[] marriott.com with JAWS to search for a hotel room."  *Id.*  Davis recorded his findings, which support his declaration.  *See id.*; https://www.youtube.com/watch?v=5ClyMMsqjHM

United States District Court  
Northern District of California

[https://www.perma.cc/S4V3-WJ52]. Davis performed the same tests on archived versions of Marriott's website from July 1–5, 2022, the date range Merrell claimed to visit the website. *See* Davis Decl. ¶¶ 18–24. On each of those dates, Davis concluded that the screen reader "read the 1 Room, 1 Guest default and . . . expand[ed] the drop-down to change the number of rooms and guests." *Id.*. From these findings, Davis concludes that a JAWS user in 2022 "would have had equal ability as a sighted user to (a) input a destination, (b) change check-in and check-out dates, (c) understand the 1 Room, 1 Guest default for a search, [and] (d) expand the drop down menu and change rooms and guests, if needed." *Id.* ¶ 26.

In addition to Davis's findings, Marriott points to the conclusions of Kass Chrisman, an employee of Marriott tasked with ensuring its website is accessible. *See* MSJ at 8. Chrisman was part of a team of four at Marriott, known as the "Search Team," that performed biweekly tests of the Marriott website "to ensure" that it remained "compatible with screen readers that visually impaired people may use to navigate the internet." Declaration of Kass Chrisman ("Chrisman Decl.") [Dkt. No. 41-2] at ¶ 5. Some of these tests were to ensure that the "drop-down menus expanded and collapsed correctly, including the drop-down for rooms and guests." *Id.* ¶ 11. Throughout 2022, the Search Team kept "detailed records" of their testing measures, including a spreadsheet that identified the glitches the team uncovered from the website. *Id.* ¶ 12. None of the bugs they identified that year included the ones that Merrell purportedly experienced in July. *See id.* ¶ 13. Chrisman reviewed Davis's videos and confirmed that the videos replicated what she and her team experienced when using screen readers on the Marriott website in 2022. *See id.* ¶¶ 15–16.

Both parties have agreed that the "observable fact[s]" found in the admissible videos each produced are facts that are subject to summary judgment. The video evidence supports Marriott. Merrell says that "on the July 2022 'Find a Hotel' page the Rooms & Guests control does not announce its expanded or collapsed state, or any default values, when activated with a screen reader," Merrell Sur-Repl. [Dkt. No. 67-3] at 1, and that other parts of the website announce an "expanded" or "collapsed" state by screen readers. *See id.* at 2. But that language is not *required* by the ADA. The Web Content Accessibility Guidelines ("WCAG")—the standard relied upon by

17

the Ninth Circuit for determining the accessibility of a website—does not impose such language requirements. *See* U.S. Dep't of Just., *Guidance on Web Accessibility and the ADA* (Mar. 18, 2022), https://www.ada.gov/resources/web-guidance/; W3C, *Introduction to Techniques for WCAG 2.0* (Oct. 7, 2016), https://www.w3.org/TR/WCAG20-TECHS/intro.html/#intro-layers-guidance; W3C, *Understanding Techniques for WCAG 2.1 Success Criteria* (Oct. 1, 2025), https://www.w3.org/WAI/WCAG21/Understanding/understanding-techniques.

What the ADA *does* require is for places of public accommodation to "take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." *Robles*, 913 F.3d at 904 (quoting 42 U.S.C. § 12182(b)(2)(A)(iii) (internal quotation marks omitted)).  Here, Marriott has provided evidence to show that this standard was met on its website.  As highlighted in Marriott's response to Merrell's sur-reply, the video reconstructions of the 2022 website show:

- JAWS reads: "rooms and guests link; to activate, press enter."  When Plaintiff's expert hits enter and tabs once, JAWS announces the 1 Room default: "room count, edit one room."  It also announces the 1 Guest default: "guest count, edit one adult per room."

- Marriott's expert Craig Davis's video of the 2022 Search Subpage shows the same thing.  For example, JAWS reads: "rooms and guests link; to activate, press enter." ECF 61-2 ¶ 16, Ex. F at 1:35 ("Davis Video") (https://www.youtube.com/watch?v=1KceddoXX18).  When Marriott's expert hits enter and tabs once, JAWS announces the 1 Room default: "room count, edit one room." *Id.* at 1:39.  JAWS also announces the 1 Guest default: "guest count, edit one adult per room." *Id.* at 1:45.

- The same is true for Plaintiff's expert's video using the NVDA screen reader.  It announces the rooms and guests drop-down and the 1 Room, 1 Guest default: "clickable rooms and guests visited, same page link."  ECF 51-1 ¶ 50, Ex. C at 1:07 to 1:09.  When Plaintiff's expert tabs to "Rooms," the screen reader

18

announces the 1 Room default: "room count edit has autocomplete selected, one room." *Id.* at 1:10 to 1:15.  It also announces the 1 Guest default: "Guest count edit has autocomplete selected, one adult per room." *Id.* at 1:25 to 1:29.

Marriott's Response to Plaintiff's Sur-Reply ("Sur-Reply Repl.") [Dkt. No. 83] at 7–8.  Taken together, these facts indicate that a blind screen reader user, whether using NVDA or JAWS, would be able to navigate Marriott's website and understand when the guests and rooms defaults were selected.  The website includes coded language, like "to activate press enter," and "clickable rooms and guests visited, same page link," that indicates to a blind individual the function of each section read by the screen reader.  *See id.* at 8.

Merrell has made clear that his goal in visiting Marriott's website was to "book one room for [him]self." *Id.* at 86:22–24.  He claims that he was "unable to input his desired number of guests" on the "Find a Hotel" page, as "the buttons to increase and decrease the number of guests were not coded to allow screen readers to announce the updated number of guests when activated." *Id.* "Instead, when the buttons were activated, [Merrell's] screen reader announced nothing, giving [him] the impression that the buttons were non-functional and preventing him from inputting the desired number of guests in order to reserve a room." *Id.* But as Davis's video reconstruction shows, JAWS announced the 1 Room default ("room count, edit one room") and the 1 Guest default ("guest count, edit one adult per room"), which would have made it possible for Merrell to make a booking through the website.  *See* Davis Video at 1:39, 1:45.

The video reconstructions show that the alleged "glitches" did not exist on Marriott's "Find a Hotel" page—at least with respect to Merrell's one room, one guest booking.  As discussed below, Merrell's evidence does not disclose a material fact in dispute.[7]

**B.     Merrell's Evidence Does Not Create A Material Dispute**

Merrell argues that the evidence marshalled by Marriott improperly focuses on the website's home page, rather than the "Find a Hotel" subpage.  MSJ Oppo. at 9.  He relies on the

---

[7] Because I am granting summary judgment on Marriott's alleged glitches argument, I decline to address Marriott's other "independent reason" for granting summary judgment, that Marriott's 24/7 reservations line counts as an auxiliary aid to the website under the ADA. *See* MSJ at 18.

United States District Court
Northern District of California

conclusions of his expert, Dr. William C. Easttom II ("Easttom"), who found that the "room/guest control failed to announce open or collapsed state, and did not announce value changes when the plus or minus controls were used" on the "Find a Hotel" subpage. Easttom Decl. ¶¶ 45–65. Easttom submitted an expert report in support of Merrell's opposition to Marriott's MSJ. *See* Easttom Expert Report [Dkt. No. 51-7]. On this evidence, Merrell believes that a jury could reasonably find that the "Find a Hotel" page failed to meet ADA requirements and form a basis for granting injunctive relief. *See* MSJ Oppo. at 10.

Marriott filed a relatively narrow motion to exclude Easttom's opinions. I GRANT it in part. I find that Easttom is qualified to testify about the structure of the website and the ease with which a blind user could access it, but I exclude:

1. The video he prepared as offered to recreate Merrell's journey on the website, primarily because he used a mouse (which a blind person would not do and which Easttom conceded was "cheating").

2. His testimony on how "a vast majority" of blind users would access the website: he is not qualified to make behavioral predictions.

3. His testimony on whether Marriott included a phone number on its website. This does not require expert opinion, and the record is clear that it did.

4. His testimony regarding the 2025 version of the website. The screenshots on which he relied in his opinion came from the 2022 "Find a Hotel" page, making his opinion unreliable.[8]

I discuss my reasons for these exclusions below.

Easttom says that he conducted multiple tests[9] to determine the accessibility of Marriott's website, including tests on both the 2022 and 2025 versions of the website. *Id.* ¶ 9–10. He contends that he examined both the default website (https://www.marriott.com/default.mi) and the "Find a Hotel" page (https://www.marriott.com/search/default.mi). *Id.* ¶ 25. He found that when

---

[8] Merrell move to strike Marriott's characterization of Easttom's declaration. It was proper advocacy, even if I did not accept all of its arguments. The motion is denied.

[9] These tests included a "combination of automated tests and manual code review." Easttom Expert Report ¶ 33.

United States District Court
Northern District of California

accessing the Marriott website with a JAWS reader, users are read information "from the top" of the website down, meaning that "the vast majority of [JAWS] users will end up in the Find a Hotel page," located at the top of the website. *Id.* ¶ 28. However, upon accessing this page with a JAWS reader, "no announcements were made when adding/removing guests or expanding/collapsing menus." *Id.* ¶ 49. In other words, when a screen reader user selected the buttons to add additional rooms or guests to the reservation, the value on the website visually changed, but the website did not announce the new number of guests or rooms in their booking. *See id.*[10]

That may be true. But this does not mean there is a dispute of material fact as applied to Merrell. As explained above, the ADA does not require "magic words" for a website to be complaint with the ADA. *See Robles*, 913 F.3d at 904. Here, the record clearly shows that Merrell's search request for "one room, one guest" was announced by JAWS, suggesting he was able to fulfill his search request. *See* Davis Decl. ¶¶ 18–24, 26. That does not contradict Easttom's video, which purportedly shows issues arising only after a user goes beyond the standard "one room, one guest" reservation. Merrell therefore cannot rely on Easttom's videos alone to generate a dispute of material fact.

### 1.    Easttom's Screen Reader Demonstration Video

Marriott first moves to exclude videos provided by Dr. Easttom in his declaration pursuant to Federal Rule of Evidence 702(a)–(d) and *Daubert*. Marriott attacks these videos on four grounds: that (i) Easttom lacks the requisite "specialized knowledge" required to provide expert testimony under Rule 702(a); (ii) Easttom's videos are unauthenticated, and Easttom lacks personal knowledge of Merrell's website experience; (iii) Easttom failed to reliably apply the methodology that produced his videos; and (iv) the scientific community would reject Easttom's

---

[10] Easttom's video reconstruction can be found at https://wilshirelawfirm-my.sharepoint.com/personal/kmaddison_wilshirelawfirm_com/_layouts/15/stream.aspx?id=%2Fpersonal%2Fkmaddison%5Fwilshirelawfirm%5Fcom%2FDocuments%2FConsumer%20Litigation%2FMarriott%20%28MRTT%20%2D%20239717%29%2FExperts%2FEasttom%2C%20Chuck%2F251029%5FRPT%5FOMSJ%2FExhibit%20B%20July%205%202022%20Find%20Hotel%20JAWS%2Emp4&ga=1&referrer=StreamWebApp%2EWeb&referrerScenario=AddressBarCopied%2Eview%2E368fb72d%2D9cb8%2D4315%2D9a70%2D32fbd332d334.

videos under *Daubert*.  Marriott Exclude Mot. at 11–14.  I find that the video is properly authenticated.  It cannot be used for the purpose Easttom had to recreate Merrell's search journey, but it can be used as evidence to demonstrate different attributes of the website that may or may not support the experts' opinions.

The fundamental problem with Easttom's videos is that he navigated Marriott's website with a mouse, "clicking through interface elements."  *See* Easttom Decl. ¶¶ 49–50.  Since blind screen-reader users "use a keyboard," not a mouse, to receive "all meaningful information from the screen reader's output," Easttom did not accurately replicate a blind user's experience with the website.  *See* Easttom Dep. at 134:25–135:2 ("I was having difficulty navigating the city and state, so I cheated.  I clicked on with a mouse, something a blind person couldn't do.").  He also contradicted himself by later claiming he "used only keyboard commands to reproduce how a blind user would interact with the page."  Easttom Sur-Reply Decl. [Dkt. No. 67-4] at ¶ 13.

Under Federal Rule of Evidence 702(c) and (d), expert testimony must be "the product of reliable principles and methods" that are reliably applied.  Marriott contends that Easttom claims to apply the "Website Accessibility Conformance Evaluation Methodology (WCAG-EM) 1.0" methods in his testing, which "requires manual navigation with a screen reader using a keyboard only."  Easttom Decl. ¶¶ 33–35, 37, 49.  Despite this, Easttom "navigated Marriott's site visually, with a mouse, while looking at the screen."  *Id.* at ¶¶ 49–50.  Such "disconnect severs [any] link between his methods and the conclusions he purports to reach."  Marriott Exclude Mot. at 13.  In the same vein, *Daubert* requires courts to consider whether an expert's testimony "has attracted widespread acceptance within a relevant scientific community."  *United States v. Baker*, 58 F.4th 1109, 1124 (9th Cir. 2023) (quoting *Daubert*, 509 U.S. at 593–94) (cleaned up).  Easttom fails this requirement; as Marriott argues, accessibility professionals "do not test accessibility by navigating websites visually, with a mouse, mixing in intermittent screen-reader output."  Marriott Exclude Mot. at 13.  Marriott's expert testified that the "accepted practice is rigorous, keyboard-only navigation representing an actual blind user's experience," which Easttom failed to do.  *Id.* (citing Davis Suppl. Decl. at ¶ 17).  Blind users typically do not use a mouse with a JAWS reader.  *See* Marriott Expert Oppo. at 12.

Merrell argues that he does not offer Easttom's videos as "full reenactments of blind browsing, or to prove that every interaction was performed exactly as a blind user would." Marriott Exclude Oppo. [Dkt. No. 96] at 4.  Rather, the videos were "offered for a narrower, technical purpose: to capture what screen readers (JAWS and NVDA) announce, or fail to announce, when the 'Rooms & Guests' control, and adding or deleting guests and rooms controls are activated." *Id.*  Further, "Rule 702(a) does not require Dr. Easttom to be a blind user or to replicate a blind user browsing in a video in order to render his opinions; it requires that his technical expertise help the Court understand the assistive-technology output and the code-level causes of that output." *Id.* at 4–5.

Merrell argues that Easttom's methodology was a "WCAG-EM conformance evaluation that combined automated testing, manual screen reader testing, and manual source-code review." Marriott Expert Oppo. at 11 (citing Easttom Decl. ¶¶ 33-35, 37-44).  Because, in his view, the "core defect at issue is not a visual artifact of how a cursor moved" but rather the "programmatic accessibility failure that determines what assistive technology can announce," Merrell concludes that Easttom's video relies on valid methodology. *See id.*  Easttom's videos "predominantly reflect keyboard-based interaction," and Marriott does not identify any "output inaccuracy" in them. *See id.*  Merrell points out that Easttom testified that he will "literally close [his] eyes" to evaluate the experience of a blind user, and that "any limited mouse use occurred only when he could not advance nonvisually 'the way a blind person would,'" which he believes "underscores the barrier rather than undermines the test."  Marriott Expert Oppo. at 12 (quoting Easttom Decl. 99:9-13).  Additionally, Merrell maintains that a dispute over the admissibility of such evidence "goes to weight and cross-examination, not exclusion under Rule 702(c) and (d)." *Id.*

Easttom has demonstrated he is qualified to opine on issues relating to website accessibility, but those qualifications do not support the video Easttom produced as a demonstration of Merrell's journey.  Easttom's concession that he "cheated" in his analysis by using a mouse, even if it was due to a "difficulty navigating the city and state" tab, is dispositive.  While Merrell contends that the purpose of the video is to test the "code-level accessibility failures," that is not what Easttom says in his declaration. *See id.*  Rather, Easttom indicated

23

himself that the purpose of his manual test, which led to the video in question, was to recreate "Plaintiff's journey based on the Complaint and deposition." If that were Easttom's goal, then it seems contradictory for Merrell to now claim that the focus was different.

As both parties acknowledge, the relevant scientific community—accessibility professionals—strive to test websites in a way that best mimics the blind user's experience. That requires utilizing screen readers exactly as blind users do. Easttom failed to do that. Instead, he combined both screen-reader outputs and his mouse in making his video. Accordingly, I conclude that the accessibility professional community would reject Easttom's video as being an inaccurate replication of an average blind screen reader user's experience. On these grounds, limitation on the use of Easttom's video testimony is warranted. Merrell may not use Easttom's videos as evidence of Merrell's search journey, but the videos are admissible to show attributes of the website.

### 2. Behavioral Predictions

Easttom also declares in his testimony that "the vast majority of users will end up in the *Find a Hotel* page" at www.marriot.com/search. Easttom Decl. ¶ 28 (emphasis in original). Marriott moves to dismiss this testimony because (i) Easttom lacks the specialized knowledge to predict such behavior; (ii) his claim lacks any methodology considering he has not previously studied blind users; and (iii) relies on unsubstantiated speculation that fails *Daubert*. Marriott Exclude Mot. at 14–19. He also seeks to exclude all similarly "speculative" claims attempting to predict any behavior from screen reader users. *Id.* at 19.

#### a. "Vast Majority"

As Marriott argues, Easttom is "not a social scientist" and is accordingly "unqualified to predict the behavior of the 'vast majority' of screen-reader users" under Rule 702(a). *Id.* at 15. While Easttom has a Ph.D. in computer science and degrees in technology and cybersecurity, these are irrelevant when considering topics regarding behavioral and social science. *Id.* Easttom conceded in his deposition testimony that he "can't really provide numbers" supporting his "vast majority" claim, as "there's no actual statistical calculation." Easttom Dep. at 116:12–21. He also indicated that his opinion was "not a statistical analysis," and was "qualitative" instead. Easttom

United States District Court
Northern District of California

24

Dep. at 117:3–16, 119:4–12.  When questioned about an earlier declaration that he had "specific training in social sciences and social science research at the graduate level," Easttom clarified, "just to be clear, I'm a computer scientist not a social scientist."  *Id.* at 120:8–13, 139:2–3.

Merrell contends that Easttom's opinion is "grounded in the mechanics of screen-reader navigation and the structure of Marriott's website," not social science.  Marriott Exclude Oppo. at 15.  His declaration explains how screen readers access the Marriott "sequentially," which creates a "default booking pathway that routes a screen-reader user from "Find & Reserve" to "Find a Hotel."  *Id.* at 15–16; Easttom Decl. at ¶¶ 28–32; Easttom Dep. at 88:1–8, 88:15–23, 90:22–91:7.  "To the extent that 'vast majority' is predictive," he argues, "it is a shorthand for Marriott's interface's default navigation path."  *Id.* at 15.  Because this inference "falls within web accessibility and usability expertise because it is derived from fixed interface order and assistive-technology mechanics, not sociological assumptions or statistical sampling," Merrell concludes this squarely falls within Easttom's expertise.  *Id.*

Easttom's deposition confirms this view.  When asked by Marriott's counsel whether a screen reader user would listen to all options before making a selection, Easttom noted:

> Actually that's not correct, and that's not just my opinion.  The WCAG standards talk about "skip to content," and they explicitly state in the standards – their words, not mine – that most people don't want to listen to a bunch of unrelated items read out.  When they get to what they want, they're going to click it.  In this case the person is trying to find a hotel.  They get to Find a Hotel, they're going to click it.  That's according to WCAG, not me . . .

> What I'm stating is that according to WCAG, the people who create these standards, that in general users want to get right to the content.  You might have noticed in these videos, the blind person is already at a disadvantage to us.  They're hearing a lot of stuff you and I ignore.  For example, when I go to book the site I don't hear "Marriott Bonvoy," "COVID-19," "Help," "English."  I skip all that and go straight to it.  The blind person is already at a disadvantage.  They have to hear all this junk.  Now you're speculating that a blind person might, having already had to wade through all this junk, having gotten to Find a Hotel, the part he wants – or she, don't want to be misogynistic – they're going to skip that just because they're got nothing to do with their time but listen to the other options.  According to WCAG, that is so unusual that they have an actual method to skip the content . . .

> My testimony is like WCAG; I believe that a blind person is seeking something.  When they get to that they'll stop.  But let's assume, to

> make this most amenable to your hypothetical, that they get to Find a Hotel and they're curious as to what comes after that. The next ones are Book Meetings and Events, Browse by Destination. They're getting further from Find a Hotel. At that point a reasonable person would go back to Find a Hotel. They're certainly not going to sit there and listen to seven different items when they already have the one they want.

Easttom Dep. at 87:25–88:8; 88:15–89:7; 90:22–91:7.

Easttom's predictions are admissible, but the "vast majority" language is excluded. Easttom indicates in his declaration that his conclusion rests on the "mechanics of screen-reader navigation and the structure of Marriott's website" rather than behavioral science. Later, in his deposition, he confirms that his view is similar to those the WCAG standards, which indicates that "most people don't want to listen to a bunch of unrelated items read out." Easttom Dep. at 88:15-89:7. It is reasonable to infer that a screen reader user may navigate in the way Easttom describes, but there is a difference between what one might "reasonably" do and what the "vast majority" of users will do. The latter language enters the realm of behavioral science, an area in which Easttom admittedly does not have expertise. Even if there exists a "substantial listening burden" for screen reader users, I do not think Easttom has the ability to opine on what the vast majority of users will do. His opinion fails to explain "the methodology, if any," that the expert relied on, *United States v. Valencia-Lopez*, 971 F.3d 891, 900–01 (9th Cir. 2020) (citing *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002)), and fails to satisfy *Daubert*, as courts may only "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Accordingly, while Easttom may testify on the WCAG standards and how websites may be experienced using a screen reader, I decline to allow Easttom to present opinions about how the "vast majority" of users will end up actually interacting with Marriott's website.

### b.   Other "Speculative" Claims

Marriott also seeks to exclude other "speculative claims" that "attempt[] to predict the behavior of screen reader users." Marriott Expert Mot. at 19; *see* Easttom Decl. ¶ 29 (speculative claims about "normal navigation" contrary to Merrell's testimony); *Id.* at ¶ 49(a) (similar);

Easttom Sur-Repl. Decl. at ¶¶ 5-6 (similar and also contrary to videos); *id.* at ¶ 10 (similar, and based on false statement of fact about Find & Reserve menu, *see* below); *id.* at ¶ 28 (similar speculative claims about how "blind users" are "likely" to behave). These motions are granted for the same reasons as discussed above.

<div align="center"><b>c.     Easttom's Reservations Line Testimony</b></div>

In his testimony, Easttom disputes whether notice of Marriott's reservations line existed on its website in 2022, as well as whether utilizing the phone service was an "equal experience [to what] a sighted person would have [when] using the website." Easttom Decl. ¶¶ 131–37. Marriott seeks to exclude this testimony because (i) Easttom lacks scientific or specialized knowledge about hotel reservations or Google searches, (ii) the testimony is rooted in insufficient data, and (iii) Easttom made "multiple knowingly false statements of fact in an attempt to mislead the Court about Marriott's reservations line." Marriott Expert Mot. at 19.

Easttom's opinions regarding the reservations line and what appears in a Google search do not require the type of "specialized knowledge" that Rule 702(a) commands. *Id.* Easttom admitted in his deposition that calling a phone number and Googling do not require specialized knowledge. *See* Easttom Dep. at 83:3–5; 100:10–12; 111:4-7. It is a matter of fact whether the phone number was available on the website. And Easttom's video disproves his theory: at twenty-nine seconds into the video, the "left side of his screen shows the 'Worldwide Telephone Reservations' link." Marriott Expert Mot. at 20 (citing Easttom Decl. Ex. I). Easttom conceded this point when he said later that "the worldwide reservations number . . . appears last under the Find and Reserve menu . . ." *See* Easttom Sur-Reply Decl. ¶ 28. Confronted with his statements, Easttom "claim[ed] there was . . . a difference between the words 'Worldwide' and 'Global.'" Marriott Expert Mot. at 20 (citing Easttom Dep. at 85:12–86:23).

Merrell contends that Easttom's testimony is offered to "opine [on] whether Marriott's phone-line workaround constitutes an equal experience for blind users attempting to reserve a room through the same online service channel sighted users use." *Id.* In other words, Merrell offers Easttom's declaration to "address[] whether the phone line provide[d] equal access for blind users." Strike Mot. at 3. That inquiry "turns on accessibility mechanics, discoverability through

<div align="center">27</div>

<div style="writing-mode: vertical-rl"></div>

United States District Court
Northern District of California

United States District Court
Northern District of California

screen readers, and equal experience," topics Merrell believes "can be assisted by an accessibility expert in evaluating." Marriott Expert Oppo. at 23.

Whether the Marriott website had the global reservations phone number listed in 2022 is a question of fact, not a matter of expert opinion. Easttom can testify on issues of "equal experience," including how a blind user may navigate the website, access the phone line, and ultimately interact with Marriott employees on the phone. Merrell seems to focus on Easttom's testimony to dispute the "interchangeab[ility]" between the "Global Reservation Phone Numbers" link Marriott offers as evidence, versus the "Worldwide Telephone Reservations" link listed within the "Find & Reserve" dropdown menu. *See* Marriott Expert Oppo. at 22. Easttom may testify how a blind individual may access those phone numbers via a screen reader, as well as how they may sequentially be presented, and the effectiveness of such phone numbers. But he cannot dispute that the phone numbers existed on the webpage.

### d.    The 2025 Review of the Current Search Subpage

Finally, Marriott moves to exclude Easttom's testimony regarding his manual review of the 2025 version of Marriott's Search Subpage (www.marriott.com/search) because it fails under both Rule 702 and *Daubert*. Easttom testified that he "visited the current" Search Subpage and found that it was not WCAG compliant. Easttom Decl. ¶ 67. But "none of the screenshots [Easttom provided in his declaration] show the current Search Subpage." Marriott Expert Mot. at 22. Instead, they are all Wayback Machine screenshots dated to July 5, 2022. *See id.* Easttom acknowledged this error at his deposition and claimed that his information was wrong. *See id.* at 22-23.

Merrell acknowledges that this screenshot was a "misfiled duplicate table," but takes issue with Marriott's conclusion that this was a product of "unreliable methods." Marriott Expert Oppo. at 25. Easttom later corrected the error, testifying this was an "inadvertent[]" act. Merrell contends that Marriott fails to mention the "separately documented bases for Dr. Easttom's current-page opinions," including his "manual source-code review of the current . . . page." *See id.*

This presents an issue of admissibility, not weight and credibility. That the manual review

table forming Easttom's opinions are based on Wayback captures from 2022 suggests a lack of evidence that he manually reviewed of the current Marriott website. Additionally, this does not seem to be a "misplaced" table, as Merrell suggests—rather, the evidence is non-existent in his declaration. Rule 702 does not allow for such evidence to be admissible. Accordingly, Easttom's declarations about the current website should be excluded.

Excluding Easttom's opinion regarding the 2025 website means that Merrell has no evidence to dispute Marriott's showing of accessibility for it. That leaves only the issue of whether the website was accessible in 2022 when Merrell searched it for a one room, one guest booking. He offered no evidence of a defect in Marriott's landing page, so the question remaining concerns the Find A Hotel subpage in 2022. The videos of Davis and Easttom definitively support Davis's opinions and Chrisman's declaration for the accessibility of the 2022 "Find A Hotel" webpage, which Easttom's unexcluded opinions do not contradict. As a result, summary judgment is GRANTED in favor of Marriott.

### C.    Unruh Act

Merrell does not dispute that, if the ADA claim is foreclosed on the grounds identified, his Unruh Act claim is also foreclosed. *See Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 731 (9th Cir. 2007). Accordingly, summary judgment will be entered on that claim too.

### III.    MOTION TO SEAL

The parties finally dispute whether the Verizon records Marriott filed in conjunction with its summary judgment reply brief should be sealed. *See* Defendant Marriott's Administrative Motion to Consider Whether Another Party's Material Should be Sealed [Dkt. No. 62] at 1. Marriott submitted Merrell's phone records to show that he was not in frequent contact with his son to disprove his potential intent to book a hotel. Merrell designated the entirety of the production confidential pursuant to the parties' Stipulated Protective Order. I agree. While the Verizon logs are relevant because of the lack of calls between Merrell and his son, the records themselves contain information about Merrell's other communications which are irrelevant, including the times of calls, the number dialed to initiate a call, and the duration of the calls. Such irrelevant but potentially identifying information seems to constitute a "compelling interest" for

sealing. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097–98 (9th Cir. 2016) (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).

**CONCLUSION**

For the reasons described above, Marriott's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated: March 9, 2026

William H. Orrick
United States District Judge

United States District Court
Northern District of California